# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **STEPHANIE N. MCGRAW,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:17cv00035 |
| | ) | **REPORT AND RECOMMENDATION** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of** | ) | By:  PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## I. Background and Standard of Review

Plaintiff, Stephanie N. McGraw, ("McGraw"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012 and 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McGraw protectively filed her application for SSI on April 26, 2013, alleging disability as of September 18, 2012, due to a back injury; depression; anxiety; obsessive compulsive disorder, ("OCD"); bilateral knee injuries; and severe allergies. (R. at 188-92, 210, 214.) The claim was denied initially and upon reconsideration. (R. at 97-99, 103-05, 109-11, 113-15.) McGraw then requested a hearing before an ALJ. (R. at 116-17.) The ALJ held a hearing on January 8, 2016, at which McGraw was represented by counsel. (R. at 42-67.)

By decision dated February 8, 2016, the ALJ again denied McGraw's claim. (R. at 10-27.) The ALJ found that McGraw had not engaged in substantial gainful activity since April 26, 2013, the date of her SSI application. (R. at 12.) The ALJ found that the medical evidence established that McGraw had severe impairments, namely low average to borderline intellectual functioning; anxiety disorder; depressive disorder; fibromyalgia; lumbago; patellofemoral syndrome; and obstructive lung defect, but he found that McGraw did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12.) The ALJ found that McGraw had the residual functional capacity to perform simple, routine, unskilled light work[1] that did not require the use of foot controls; that required only

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2018).

occasional climbing, stooping, kneeling, crouching and crawling and exposure to pulmonary irritants and chemicals; that did not require exposure to hazards, strict production rate or pace work or interaction with the public; and that required no more than occasional decision making, changes in the work setting or interaction with co-workers. (R. at 15.) The ALJ found that McGraw was unable to perform her past relevant work. (R. at 26.) Based on McGraw's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that McGraw could perform, including jobs as a garment folder, a garment bagger and a retail marker. (R. at 26-27.) Thus, the ALJ concluded that McGraw was not under a disability as defined by the Act, and was not eligible for SSI benefits. (R. at 27.) *See* 20 C.F.R. § 416.920(g) (2018).

After the ALJ issued his decision, McGraw pursued her administrative appeals, (R. at 183-85), but the Appeals Council denied her request for review. (R. at 1-5.) McGraw then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2018). This case is before this court on McGraw's motion for summary judgment filed March 12, 2018, and the Commissioner's motion for summary judgment filed April 6, 2018.

## II. Facts

McGraw was born in 1983, (R. at 188), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). McGraw obtained her general equivalency development, ("GED"), diploma, and she has past work as a kitchen worker, a lunch lady and a custodian. (R. at 48, 62, 215.) McGraw stated that she

homeschooled her nine-year-old daughter. (R. at 50-51.) She stated that she instructed her daughter two to three hours a day. (R. at 52.) McGraw stated that she suffered from emotional difficulties as a result of having an abortion at age 13 and being in many abusive relationships. (R. at 53.) She stated that her medications caused fatigue and affected her ability to concentrate. (R. at 54.) McGraw stated that she used an Albuterol inhaler up to four times a day. (R. at 60.)

Rick Bradley, a vocational expert, was present and testified at McGraw's hearing. (R. at 62-66.) Bradley was asked to consider a hypothetical individual of McGraw's age, education and work history, who could perform simple, routine, unskilled light work that did not require the use of foot controls; that did not require exposure to hazards, including hazardous machinery and unprotected heights; that did not require climbing of ladders, ropes or scaffolds; that did not require more than occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling or exposure to pulmonary irritants such as fumes, odors, dusts, gases, poorly ventilated areas and chemicals; that did not require more than occasional decision making, changes in the work setting or strict production rate or pace requirements; that did not require interaction with the public; and that required no more than occasional interaction with co-workers. (R. at 63.) Bradley stated that such an individual could not perform McGraw's past relevant work, but that the individual could perform light, unskilled jobs that existed in significant numbers in the national economy, including those of a garment folder, a garment bagger and a retail marker. (R. at 64.) Bradley stated that there would be no jobs available that the individual could perform should she be unable to follow work rules, to relate to others, to function independently, to behave in an emotionally stable manner and miss two to three days of work a month. (R. at 64-65.) He stated

that there would be no jobs available should the individual be limited to sedentary[2] lifting and carrying; who could stand and/or walk only 30 minutes a day; and who could sit for only 30 minutes to one hour a day. (R. at 65.) Bradley further testified that there would be no jobs available should the individual be off task more than 10 percent of a workday. (R. at 65.)

In rendering his decision, the ALJ also reviewed records from Wise County Public Schools; Stephanie Fearer, Ph.D., a state agency psychologist; Dr. Andrew Bockner, M.D., a state agency physician; Dr. Jack Hutcheson, M.D., a state agency physician; Mountain View Regional Medical Center, ("Mountain View"); Dr. Jim C. Brasfield, M.D.; Mountain States Health Alliance; Appalachian Rehabilitation Team, Inc.; Dr. Uzma Ehtesham, M.D., a psychiatrist; Dr. James W. Campbell, D.O.; Stacey Gipe, P.A., a physician's assistant; Lonesome Pine Hospital, ("Lonesome Pine"); Norton Community Hospital; MSMG Community Orthopedics; Mountain View Regional Cardiopulmonary; Dr. Vijay Kumar, M.D.; Dr. Tony O. Haley, M.D.; Dr. James T. Potter, Jr., M.D.; and Dr. John Iaquinto, M.D.

On February 18, 1998, McGraw, a ninth-grade student at the time, was referred for evaluation upon her father's request, to determine if special education services were needed. (R. 292-310.) The Wechsler Intelligence Scale for Children Third Edition, ("WISC-III"), was administered, and McGraw obtained a full-scale

---

[2] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2018).

IQ score of 84±3. (R. at 308.) McGraw was found to not be eligible for special education classes. (R. at 298.)

On March 12, 2010, McGraw saw Dr. James W. Campbell, D.O., for complaints of anxiety, depression and fatigue. (R. at 400-02.) McGraw was alert and oriented; no focal deficits were noted; her muscle strength was normal and equal in the upper and lower extremities; and her gait and speech were grossly intact. (R. at 401.) Dr. Campbell diagnosed anxiety/depression with possible panic attacks, fatigue and decreased libido. (R. at 401.) On April 12, 2010, McGraw reported that Celexa controlled her anxiety and panic attacks. (R. at 394.) On September 21, 2010, McGraw reported that Celexa was not working, as she was more stressed and anxious. (R. at 391.) McGraw stated that she had mood swings and had repeatedly started checking things in the house. (R. at 391.) Stacey Gipe, P.A., a physician's assistant, reported that McGraw was in no distress, her affect was good, and she did not appear to be anxious or depressed. (R. at 391.) Gipe diagnosed anxiety with symptoms of OCD. (R. at 391.)

On September 13, 2012, McGraw presented to the emergency room at Lonesome Pine for complaints of low back pain. (R. at 414-20.) Her mental status and pulmonary examination were within normal limits. (R. at 415-17.) McGraw's back was nontender; straight leg raising tests were positive on the right; deep tendon reflexes and strength were symmetrical; and her mood and affect were normal. (R. at 416-17.) X-rays of McGraw's lumbar spine showed mild L5-S1 disc space narrowing. (R. at 444.) X-rays of McGraw's thoracic spine and right hip were normal. (R. at 445-46.) She was diagnosed with sciatica. (R. at 417.) On December 10, 2012, McGraw saw Dr. Campbell for complaints of intermittent right hip pain. (R. at 385.) McGraw stated that she had fallen due to loss of

sensation in her right leg. (R. at 385.) Dr. Campbell diagnosed mild recurrent major depression and hip joint pain. (R. at 385.)

On April 10, 2013, McGraw presented to the emergency room at Lonesome Pine for complaints of low back pain and spasms. (R. at 421-25.) Musculoskeletal examination showed normal strength and range of motion, as well as tenderness to palpation at the T5-L1 level, and McGraw had normal mood, affect and cognition. (R. at 423.) McGraw was diagnosed with lumbar sprain. (R. at 423.) On April 16, 2013, McGraw presented to the emergency room at Lonesome Pine for complaints of back pain. (R. at 426-35.) McGraw had no lower extremity weakness or sensory findings; normal muscle strength and tone; equal and symmetrical reflexes; adequate range of motion; no significant deformity of the lower back; lower thoracic spine tenderness; right and left paravertebral spasm; and no extremity edema or calf tenderness. (R. at 429.) She was diagnosed with backache and paravertebral muscle spasm. (R. at 429.)

On May 28, 2013, Dr. Jim C. Brasfield, M.D., saw McGraw for her complaints of lumbar discomfort and knee pain. (R. at 343-44.) Dr. Brasfield reported that McGraw ambulated well; her reflexes were normal; straight leg raising tests were negative; her spine was straight; and she had normal strength in both legs. (R. at 343.) X-rays of McGraw's lumbar spine and right hip were normal. (R. at 343.) Dr. Brasfield ordered a nuclear bone scan. (R. at 344.) On June 14, 2013, McGraw continued to complain of bilateral knee pain and "some low back pain." (R. at 345-46.) Dr. Brasfield noted that McGraw had positive medial joint line tenderness, indicative of a probable meniscal tear. (R. at 345.) Dr. Brasfield diagnosed low back pain with bilateral knee complaints, and orthopedic referral was recommended. (R. at 345.)

On July 17, 2013, Dr. Campbell saw McGraw for complaints of worsening depression. (R. at 380-81.) Dr. Campbell reported that McGraw's physical examination was normal, and her mood was dysthymic, empty, unhappy, depressed and anxious. (R. at 380-81.) Dr. Campbell diagnosed worsening major depression, recurrent, and insomnia, and he referred her to psychiatry and counseling for further evaluation. (R. at 381.)

On August 26, 2013, McGraw presented to the emergency room at Norton Community Hospital for complaints of bilateral knee pain. (R. at 355-62.) X-rays of McGraw's knees were normal. (R. at 360-61.) McGraw was diagnosed with Osgood-Schlatter disease,[3] knee pain and calcific tendonitis of the knees. (R. at 355, 357.)

On September 4, 2013, McGraw saw Dr. John Iaquinto, M.D., for complaints of bilateral anterior knee pain. (R. at 696.) McGraw's knees had full range of motion, no ligamentous laxity, positive patellar apprehension and compression test bilaterally and mild effusion on the left. (R. at 696.) Dr. Iaquinto diagnosed bilateral patellofemoral syndrome with a history of Osgood-Schlatter disease and prominent tibial tubercles bilaterally, possibly degenerative meniscus tear. (R. at 696.) Dr. Iaquinto ordered physical therapy. (R. at 696.) In September 2013, McGraw underwent physical therapy at Appalachian Rehabilitation Team, Inc., for her complaints of bilateral anterior knee pain. (R. at 363-76.) On September 27, 2013, McGraw reported that therapy helped her right knee, but that her left knee continued to be worse. (R. at 372-76.) It was noted that McGraw had made some improvements with therapy, including decreased right knee pain;

---

[3] Osgood-Schlatter disease is defined as osteochondrosis of the tibial tubercle. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 587 (1995).

however, she continued to have quad tightness and pain and swelling in both knees. (R. at 373, 375.)

The record shows that McGraw saw Dr. Uzma Ehtesham, M.D., a psychiatrist, from October 2013 through December 2015, who diagnosed McGraw with panic disorder without agoraphobia; and major depressive affective disorder, recurrent episode, moderate. (R. at 520-53, 563-65, 700-45, 782-86.)[4] On October 2, 2013, Dr. Ehtesham reported that McGraw had an anxious affect and congruent mood and thought. (R. at 520-25.) McGraw complained of anger and anxiety. (R. at 520.) Dr. Ehtesham routinely assessed McGraw's then-current Global Assessment of Functioning, ("GAF"),[5] score at 58.[6] (R. at 525, 529, 553.)

During treatment, Dr. Ehtesham reported that McGraw's anxiety ranged from a three to an eight on a 10-point scale. (R. at 530, 532, 534, 536, 538, 544, 547, 550, 557, 561, 705, 708, 710, 715, 718, 721, 724, 727, 730, 733, 736, 739, 741.) Dr. Ehtesham reported that McGraw's depression ranged from a one to five on a 10-point scale. (R. at 526, 530, 532, 534, 536, 538, 541, 544, 547, 550, 554, 561, 705, 708, 710, 715, 718, 727, 730, 736, 739, 741, 783, 785.) Dr. Ehtesham reported that McGraw's panic ranged from a two to three on a 10-point scale. (R. at 526, 541, 544, 554.)  Dr. Ehtesham routinely found that McGraw displayed no

---

[4] McGraw's diagnosis remained stable, and only minor medication changes were made. (R. at 702-03, 782.)

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

symptoms of post-traumatic stress disorder, ("PTSD"), or difficulties with attention; she had fair hygiene and grooming; normal motor activity and gait; a euthymic and congruent affect; improved insight; fair to intact judgment; and goal-oriented thought process. (R. at 520, 526, 530, 532, 534, 536, 538-39, 541, 544, 547, 550, 554-55, 557, 559, 561, 708-09, 710-11, 713, 716-17, 719, 722-23, 725-26, 728-29, 731-32, 734-35, 737, 740, 742, 784, 786.)

On October 7, 2013, Stephanie Fearer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that McGraw suffered from an affective disorder. (R. at 73-74.) Fearer found that there was insufficient evidence to evaluate McGraw's mental functioning. (R. at 73-74.)

On October 14, 2013, Stacey Gipe, P.A., saw McGraw for her complaints of headaches and dizziness. (R. at 382-83.) Gipe noted that McGraw had some positive fibromyalgia trigger points around the clavicles, posterior neck, shoulders, elbows and knees. (R. at 382.) McGraw had a euthymic mood. (R. at 382.) Gipe diagnosed acute sinusitis, depression and fibromyalgia. (R. at 383.)

On October 18, 2013, Dr. Ehtesham completed a mental assessment, indicating that McGraw had a seriously limited ability to follow work rules; to deal with the public; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to maintain personal appearance; and to relate predictably in social situations. (R. at 377-79.) Dr. Ehtesham opined that McGraw had no useful ability to relate to co-workers; to use judgment; to interact with supervisors; to deal with work stresses; to understand, remember and carry out detailed and simple job instructions; to behave

in an emotionally stable manner; and to demonstrate reliability.[7] (R. at 377-78.) She found that McGraw would be absent from work more than two days a month. (R. at 379.)

On October 29, 2013, McGraw reported to Dr. Ehtesham that her depression was improving. (R. at 530.) On November 12, 2013, McGraw reported to Gipe that she was doing much better since increasing Celexa. (R. at 384.) McGraw stated that ibuprofen also helped control her pain. (R. at 384.) McGraw reported "marked improvement." (R. at 384.) Gipe reported that McGraw was smiling and that her affect was good. (R. at 384.) On December 30, 2013, McGraw reported to Dr. Ehtesham that her depression was improving. (R. at 536.) Dr. Ehtesham noted that McGraw displayed no evidence of sadness.[8] (R. at 536.)

On April 9, 2014, McGraw presented to the emergency room at Norton Community Hospital for complaints of right upper back pain and a knot under her right jawbone. (R. at 493-95.) She was diagnosed with chronic back pain, inflammation of the salivary glands and inflammation of the parotid gland. (R. at 509, 511, 515.) On April 23, 2014, McGraw saw Dr. Shahab Ehtesham, M.D., ("Dr. S. Ehtesham"), for complaints of back and knee pain. (R. at 504-08.) McGraw denied anxiety, depression and sleep problems. (R. at 505.) He diagnosed bilateral knee pain and allergic rhinitis. (R. at 507.)

---

[7] The court notes that Dr. Ehtesham's finding that McGraw had a seriously limited ability to understand, remember and carry out complex job instructions cannot be reconciled with her finding that McGraw had no useful ability to understand, remember and carry out simple and detailed job instructions.

[8] In 2014 and 2015, McGraw reported that she was "alright" and "doing well," and Dr. Ehtesham noted that McGraw's mood was stable. (R. at 538, 544, 561, 710.)

On May 1, 2014, Dr. Andrew Bockner, M.D., a state agency physician, completed a PRTF, finding that McGraw suffered from an affective disorder. (R. at 85-86.) He opined that McGraw had mild limitations in her activities of daily living; experienced moderate difficulties in maintaining social functioning; experienced moderate difficulties in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 85-86.) Although Dr. Bockner noted that McGraw had a moderate level of depression, he found that she was capable of performing simple, routine tasks. (R. at 86.)

That same day, Dr. Bockner completed a mental assessment, indicating that McGraw's ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited. (R. at 89-91.) He found that McGraw was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. (R. at 89-90.)

On May 1, 2014, Dr. Jack Hutcheson, M.D., a state agency physician, found that McGraw had the residual functional capacity to perform light work. (R. at 87-89.) He found that McGraw could occasionally climb, stoop, kneel, crouch and crawl and frequently balance. (R. at 88.) No manipulative, visual or communicative limitations were noted. (R. at 88.) Dr. Hutcheson found that McGraw should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 89.)

On May 6, 2014, x-rays of McGraw's knees showed old Osgood-Schlatter's disease bilaterally. (R. at 638.) On May 28, 2014, Dr. S. Ehtesham reported that McGraw had normal range of motion of her knees, normal knee strength and a mildly antalgic gait. (R. at 501-03.) Dr. S. Ehtesham diagnosed patellofemoral syndrome and patellar tendinitis. (R. at 503.)

On June 30, 2014, Dr. Kent P. VanBuecken, M.D., reported that McGraw's left knee showed no effusion or instability; she had some pain, but no crepitus on patellofemoral loading exercises; she had obvious Osgood-Schlatter residual ossicles on both tibial tubercles, and both were fairly mobile with some pain; there were no signs of patellar tendinitis on either knee; and both knees were stable in all planes. (R. at 497-98.) McGraw reported that wearing a knee brace provided relief. (R. at 497.) Dr. VanBuecken diagnosed bilateral patellofemoral pain syndrome. (R. at 498.)

On August 20, 2014, Dr. S. Ehtesham reported that McGraw had normal range of motion of her knees, normal knee strength and a mildly antalgic gait. (R. at 499-500.) X-rays of McGraw's knees showed evidence to suggest that, as a

child, McGraw had suffered from Osgood-Schlatter disease. (R. at 500.) Dr. S. Ehtesham diagnosed knee pain. (R. at 500.)

On October 31, 2014, Dr. Ehtesham completed a mental assessment, indicating that McGraw had a satisfactory ability to interact with supervisors; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex, detailed and simple job instructions; to maintain personal appearance; to relate predictably in social situations; and to demonstrate reliability. (R. at 563-65.) She opined that McGraw had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to function independently; and to behave in an emotionally stable manner. (R. at 563-64.) Dr. Ehtesham stated that McGraw would be absent from work more than two days a month. (R. at 565.)

On May 13, 2015, McGraw saw Dr. James T. Potter, Jr., M.D., for an allergy consultation. (R. at 571-72.) Pulmonary examination revealed no wheezing or rhonchi. (R. at 571.) Examinations of McGraw's back and musculoskeletal system were normal. (R. at 571.) Dr. Potter diagnosed chronic sinusitis; allergic rhinitis; chronic allergic conjunctivitis; acute allergic serous otitis media; and anaphylaxis due to bee venom. (R. at 572.)

On May 14, 2015, McGraw saw Dr. Vijay Kumar, M.D., for complaints of knee pain, low back pain and anxiety. (R. at 685-86.) Dr. Kumar diagnosed anterior knee pain, low back pain and generalized anxiety disorder. (R. at 686.) Although Dr. Kumar noted lower lumbar paraspinal tenderness throughout 2015, (R. at 677, 679, 683, 686, 773, 775), no specific treatment for back pain was noted or recommended, other than to continue taking Motrin for pain. (R. at 686.)

On June 5, 2015, McGraw presented to the emergency room at Norton Community Hospital for complaints of shortness of breath. (R. at 655-60.) A chest x-ray was normal. (R. at 659.) McGraw was diagnosed with bronchitis. (R. at 656.)

On September 1, 2015, Robert Muller, Ph.D., a licensed clinical psychologist, completed medical interrogatories concerning McGraw's mental impairments. (R. at 616-20.) He indicated that he had not personally examined McGraw. (R. at 616.) Muller reported that a review of the medical evidence indicated that McGraw received treatment for a major depressive disorder, moderate, and an anxiety disorder. (R. at 616.) He opined that McGraw had moderate limitations in her activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 617.) Muller opined that McGraw's impairments did not meet or equal the criteria for any impairment described in the Listing of Impairments. (R. at 618.) He stated that McGraw would be capable of performing simple tasks in a low-stress work environment that had minimal contact with the general public. (R. at 620.) Muller noted that McGraw probably would perform best in a small group setting. (R. at 620.)

Muller also completed a mental assessment, indicating that McGraw had slight limitations in her ability to understand, remember and carry out simple instructions. (R. at 621-23.) He found that McGraw had a satisfactory ability to make judgments on simple work-related decisions; to interact appropriately with supervisors and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 621-22.) Muller found that McGraw was seriously limited in her ability to understand, remember and carry out

complex instructions; to make judgments on complex work-related decisions; and to interact appropriately with the public. (R. at 621-22.)

On October 7, 2015, Paige Cordial, Psy.D., a licensed clinical psychologist, evaluated McGraw at the request of McGraw's attorney to provide information for McGraw's social security disability case. (R. at 748-56.) Cordial noted that McGraw was well-groomed and appropriately dressed, cooperative, polite and forthcoming. (R. at 748.) She reported that McGraw had no problems with inattention and had clear and linear thought patterns. (R. at 748.) The Kaufman Brief Intelligence Test, Second Edition, ("K-BIT II"), was administered, and McGraw obtained a verbal IQ score of 86, a nonverbal IQ score of 84 and a full-scale IQ score of 83. (R. at 753.) The Beck Depression Inventory, Second Edition, ("BDI-II"), results indicated that McGraw suffered from moderate depression. (R. at 753.) The Beck Anxiety Inventory, Second Edition, ("BAI-II"), indicated that McGraw had minimal panic symptoms. (R. at 754.) The PTSD Checklist – Civilian Form, ("PCL-C"), suggested that McGraw had significant symptoms of PTSD. (R. at 754.) Cordial diagnosed persistent depressive disorder with recurrent major depressive episodes, generalized anxiety disorder and borderline intellectual functioning. (R. at 756.)

On October 20, 2015, Dr. Kumar completed a medical assessment, indicating that McGraw could lift and carry items weighing up to 10 pounds occasionally and up to five pounds frequently; stand and/or walk a total of 30 minutes in an eight-hour workday and that she could so for up to 10 minutes without interruption; sit a total of 30 minutes in an eight-hour workday and that she could do so for up to 10 minutes without interruption; occasionally stoop, kneel, balance, crouch and crawl and never climb; she had a limited ability to push and

pull; and she was restricted from working around moving machinery. (R. at 688-90.) Dr. Kumar opined that McGraw would be absent from work more than two days a month. (R. at 690.)

That same day, Dr. Kumar completed a mental assessment, indicating that McGraw had a slight limitation in her ability to maintain personal appearance. (R. at 693-95.) He found that McGraw had a satisfactory ability to follow work rules; to relate to co-workers; to use judgment; to function independently; to understand, remember and carry out simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 693-94.) Dr. Kumar opined that McGraw had a seriously limited ability to deal with the public; to interact with supervisors; to deal with work stresses; and to understand, remember and carry out detailed job instructions. (R. at 693-94.) He found that McGraw had no useful ability to maintain attention and concentration and to understand, remember and carry out complex job instructions. (R. at 693-94.) He opined that McGraw would be absent from work more than two days a month. (R. at 695.)

On October 29, 2015,[9] Dr. Ehtesham completed a mental assessment, indicating that McGraw had a satisfactory ability to follow work rules; to deal with the public; to interact with supervisors; to function independently; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 765-67.) She found that McGraw had a seriously limited ability to relate to co-workers;

---

[9] That same day, Dr. Ehtesham completed another mental assessment, indicating that McGraw had moderate to marked limitations in her ability to make performance and personal/social adjustments. (R. at 744-45.) She opined that McGraw would be absent from work more than two days a month. (R. at 745.) The record does not contain page one of this assessment.

to use judgment; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; to maintain personal appearance; and to demonstrate reliability. (R. at 765-66.) Dr. Ehtesham opined that McGraw had no useful ability to understand, remember and carry out simple job instructions.[10] (R. at 765-66.) She opined that McGraw would be absent from work more than two days a month. (R. at 767.)

On November 10, 2015, McGraw presented to the emergency room at Mountain View with complaints of chest congestion and cough. (R. at 792-99.) McGraw was in no respiratory distress, she had wheezes, but no rales, and her mood and affect were normal. (R. at 794-95.) Chest x-rays were normal. (R. at 797.) On November 30, 2015, McGraw underwent a pulmonary function test, which showed a mild obstructive lung defect. (R. at 811.)

On December 4, 2015, Cordial completed a mental assessment, indicating that McGraw was mildly limited in her ability to follow work rules; to use judgment; to function independently; to maintain attention and concentration; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 758-60.) She found that McGraw had a satisfactory ability to relate to co-workers; to interact with supervisors; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; and to demonstrate reliability. (R. at 758-59.) Cordial opined that McGraw was seriously limited in her ability to deal with the public; to deal with work stresses; to understand, remember and carry out complex job instructions;

---

[10] The court again notes that Dr. Ehtesham's findings regarding McGraw's abilities to understand, remember and carry out job instructions cannot be reconciled.

and to relate predictably in social situations. (R. at 758-59.) She opined that McGraw would be absent from work more than two days a month. (R. at 760.)

On December 12, 2015, McGraw presented to the emergency room at Mountain View for complaints of back pain. (R. at 801-10.) Her lumbar spine had decreased range of motion, tenderness, pain and spasm with no bony tenderness, swelling or edema. (R. at 803.) She had normal strength, reflexes, muscle tone and coordination; straight leg raising tests were negative; and her mood, affect and behavior were deemed normal. (R. at 804.) X-rays of McGraw's hips, pelvis and lumbar spine were normal. (R. at 776, 778, 806.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

McGraw argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) McGraw argues that the ALJ failed to give controlling weight to the findings of Drs. Kumar and Ehtesham and psychologist Cordial when determining her residual functional capacity. (Plaintiff's Brief at 5-7.)

McGraw argues that the ALJ failed to give controlling weight to the findings of Drs. Kumar and Ehtesham and psychologist Cordial when determining her residual functional capacity. (Plaintiff's Brief at 5-7.) Based on my review of the record, I find this argument unpersuasive. While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a consultative examiner. *See* 20 C.F.R. § 416.927(c) (2018). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

The ALJ gave Dr. Ehtesham's opinions "little" weight because they were contradicted by her own treatment notes. (R. at 21.) *See* 20 C.FR. § 416.927(c)(4) (ALJ should discount opinions that are inconsistent with the record); *see also*

*Craig*, 76 F.3d at 590 ("if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").  The ALJ noted that Dr. Ehtesham completed the first mental assessment after seeing McGraw only once or twice. (R. at 21, 377-79.) The ALJ then reviewed each of the four assessments, noting in particular that the two assessments completed on October 29, 2015, directly contradicted each other. (R. at 21, 744-45, 765-67.) The ALJ noted that while Dr. Ehtesham opined that McGraw had severe social anxiety, her treatment notes failed to mention social anxiety, and she diagnosed a panic disorder without agoraphobia. (R. at 21, 701, 706, 713.) Similarly, the ALJ observed that, unlike on the mental assessments, memory and concentration issues were never mentioned in Dr. Ehtesham's treatment notes. (R. at 21, 554, 557, 559, 561, 705, 708, 710, 712, 716, 719, 722, 725, 728, 731, 737, 739, 742, 783, 785.) In addition, Dr. Ehtesham routinely found that McGraw had fair hygiene and grooming; normal motor activity and gait; a euthymic and congruent affect; improved insight; fair to intact judgment; and goal-oriented thought process. (R. at 520, 526, 530, 532, 534, 536, 538-39, 541, 544, 547, 550, 554-55, 557, 559, 561, 708-09, 710-11, 713, 716-17, 719, 722-23, 725-26, 728-29, 731-32, 734-35, 737, 740, 742, 784, 786.) Furthermore, in contrast to the severe symptoms indicated in the mental assessments, Dr. Ehtesham assigned only moderate GAF scores. (R. at 22, 525, 529, 553.) The record shows that McGraw reported that she was doing well and that her symptoms of depression improved with medication. (R. at 538, 543-44, 553, 561, 710.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ noted that he was giving Dr. Kumar's opinions "little" weight because they were inconsistent with the medical evidence of record. (R. at 23.) The

ALJ noted that Dr. Kumar's finding that McGraw was limited to lying down seven out of eight hours in a workday was extreme. (R. at 23, 688-90.) Dr. Kumar based these findings on McGraw's back pain, but the medical evidence contains only mild findings, such as tenderness and muscle spasm. (R. at 677, 679, 683, 686, 773, 775.) In September 2012, x-rays of McGraw's lumbar spine showed mild L5-S1 disc space narrowing, and, in May 2013, x-rays of McGraw's lumbar spine were normal. (R. at 343, 444.) In August 2013 and June 2014, x-rays of McGraw's knees were normal. (R. at 360-61, 497-98.) Examinations revealed that McGraw had normal muscle strength and tone; normal range of motion; no lower extremity weakness or sensory deficits; reflexes were equal and symmetrical; negative straight leg raising tests; and a mildly antalgic gait. (R. at 343, 380-81, 423, 429, 500, 502.) Dr. Kumar's treatment notes contain only mild findings, such as tenderness and muscle spasm, and he recommended that McGraw take Motrin. (R. at 23, 677, 679, 683, 686, 773, 775.)

The ALJ also noted that he was giving Dr. Kumar's opinion concerning McGraw's mental limitations "very little" weight because he did not treat McGraw's mental impairments. (R. at 23, 693-95.) A review of the record shows that Dr. Kumar prescribed Klonopin for McGraw's symptoms of anxiety; however McGraw reported that her symptoms were controlled with medication. (R. at 538, 543-44, 553, 561, 680, 682, 710.)

The ALJ gave Cordial's assessment "limited" weight because she saw McGraw only once and "some parts of her opinion, particularly the marked limitations," were not consistent with McGraw's medical treatment records. (R. at 22, 758-60.) While McGraw reported symptoms of anxiety and depression, she also reported that her symptoms were controlled with medication. (R. at 538, 543-

44, 553, 561, 710.) *See Gross,* 785 F.2d at 1166. In fact, the record shows that McGraw rated her depression a one to five on a 10-point scale, and Dr. Ehtesham found that McGraw had intact judgment and was goal-oriented. (R. at 520, 526, 530, 532, 534, 536, 538-39, 541, 544, 547, 550, 554-55, 557, 559, 561, 705, 708-09, 710-11, 713, 715, 717-19, 723, 726-27, 729-30, 732, 734-37, 739-42, 783-86.)

The ALJ noted that he was giving the assessments of Muller and Drs. Bockner and Hutcheson "significant" weight, as their assessments were consistent with the record as a whole. (R. at 23-24, 85-89, 621-23.) An ALJ may rely upon the opinion of a state agency physician. *See* 20 C.F.R. § 416.927(e)(2)(i) (2015)[11] ("State agency medical and psychological consultants ... are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants ... as opinion evidence, except for the ultimate determination about whether you are disabled."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians"); Social Security Ruling, (S.S.R.), S.S.R. 96–6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2013 Supp.) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."). Based on this, I find that substantial evidence exists to support the ALJ's weighing of the evidence with regard to McGraw's residual functional capacity.

---

[11] This was the relevant regulation in effect at the time of the ALJ's decision.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding with regard to McGraw's residual functional capacity; and

2. Substantial evidence exists in the record to support the Commissioner's finding that McGraw was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McGraw's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The

judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    February 20, 2019.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE